Filed 3/26/15  In re X.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re X.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E061891 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1200397) |
| v. | O P I N I O N |
| F.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, and Anna M. Marchand, Deputy County

Counsel, for Plaintiff and Respondent.

1

# I. INTRODUCTION

In this juvenile dependency case, defendant and appellant, F.M. (Father), appeals from orders denying his request to change court order pursuant to Welfare and Institutions Code section 388[1] (section 388 petition) and terminating his parental rights with respect to his son, X.M. We affirm the court's orders.

# II. FACTUAL AND PROCEDURAL BACKGROUND

A. *Detention, Jurisdiction, and Disposition (March 2012 – May 2012)*

Between 2005 and 2011, Father had five convictions for driving under the influence (DUI) and a parole violation that resulted in him being incarcerated "off and on" for three years.[2] By the time he was released from prison in July 2011, X.M. was five years old. About one month later, Father was arrested for DUI a sixth time, and incarcerated until February 24, 2012. Following his release, he remained under "house arrest" for eight months and lived with a friend in San Bernardino.

On March 9, 2012, C.C. (Mother) sought and obtained a temporary restraining order (TRO) against Father based on three incidents of alleged domestic abuse. In one

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The dates of Father's arrests and convictions, and the periods of his confinement are not clear from our record. According to the social worker, Father stated "he did 3 years of prison time for" DUI's since 2005 or 2006, and was released on July 11, 2011. At another point, he said "he was locked up for eighteen months in 2010 for a parole violation." Our record also includes a report from the Illinois Department of Children & Family Services indicting that Father told an Illinois social worker that he was not around X.M. for two years while he was in jail in California. The same report indicates an August 2011 arrest and October 2011 conviction for DUI and a sentence of 16 months.

incident, Father allegedly threatened Mother with a knife. In another, he grabbed and choked Mother and threatened to ""blow [her] head off."" In her application for the TRO, Mother stated that she felt "unsafe and as a mother need [*sic*] to protect [her] son's welfare and well being because [she felt] [Father] will harm him to get at [her.]" Notwithstanding the TRO, Mother allowed X.M. to stay with Father during X.M.'s spring break from school because she did not have other child care arrangements.

In late March 2012, plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), received reports that Mother took X.M. with her to the homes of others and used methamphetamine in his presence. The social worker's investigation revealed evidence of domestic violence and abuse between Mother and Father, Father's criminal history, which included a 1994 armed robbery conviction as well as the DUI convictions, and the parents' history of substance abuse.

DPSS took X.M. into protective custody and filed a petition under section 300, subdivision (b). DPSS alleged that X.M. was within the jurisdiction of the juvenile court because he had suffered, or there was a substantial risk that he would suffer, serious physical harm or illness because his parents (1) have failed or are unable to protect him, and (2) are unable to care for him due to their substance abuse. In particular, DPSS alleged: Mother abused controlled substances, including methamphetamine, while providing care for X.M.; Mother and Father engaged in ongoing acts of domestic violence in X.M.'s presence and, despite an active restraining order protecting X.M. from Father, Mother allowed X.M. to remain in Father's care; and Father had a history of

abusing alcohol, had been convicted of DUI on six occasions, and was currently under house arrest.

Following a hearing, the court detained X.M. from the parents and placed him in DPSS custody. DPSS placed him with a nonrelated, extended family member.

In a jurisdictional/dispositional report, DPSS reported that there were several problems requiring intervention to protect X.M. "First and foremost is the fact that the parents have been engaging in ongoing acts of domestic violence while in the presence of the child." In addition, both parents had violated the TRO and neither took responsibility for their actions; Mother abused methamphetamine while caring for X.M.; Father had problems with alcohol; and Father had "unstable housing" and was "unable to provide care for his child."

At the jurisdictional/dispositional hearing, the court found true the allegations in the petition and declared X.M. a dependent of the court. The court approved of the case plan for the parents. Among the objectives of Father's plan were: "Obtain resources to meet the needs of your child(ren) and to provide a safe home"; "[a]ttend and demonstrate progress in a County Certified Domestic Violence Prevention Plan"; "[e]xpress anger appropriately and do not act negatively on your impulses"; "[s]tay sober and show your ability to live free from alcohol dependency"; and "[o]btain and maintain a stable and suitable residence for yourself and your child(ren)." Father's plan required counseling, participation and completion of a domestic violence program, and substance abuse testing.

4

B.  *Six-month Review Period (May 2012 – November 2012)*

The court authorized visits between the parents and X.M. once per week, and Father was allowed to speak with X.M. by telephone three times per week.  During the six-month review period, from May to November 2012, Father's visits were inconsistent. He visited one or two times per month, with visits lasting from 10 minutes to two hours. In August 2012, the caregiver requested that X.M. be moved from her home because "she could no longer deal with [Father's] excessive phone calls, text[s], name calling, and irate behavior."  X.M. was placed in a new foster home in September.

In August, Father moved to Chicago, Illinois.  Because of the distance, he could no longer visit X.M. in person, but did speak to him at least three times per week.

The social worker reported that Father's progress and compliance with his case plan was "satisfactory" and "adequate."  He was participating in counseling through the "Anger Clinic" and completed a parenting program, even though it was not required by his case plan.  Although he had failed to participate in an anger management program, the social worker noted that "he is working on his anger" with his therapist.  He had failed to participate in random drug testing.  His therapist reported that she tested Father once and the test was negative for illegal substances.

Mother's progress on her case plan was "unsatisfactory."  She failed to consistently participate in counseling, a domestic violence program, a substance abuse program, or random drug testing.

In October 2012, a maternal aunt living in Maryland expressed her desire to care for and adopt X.M.

At the six-month review hearing held in November 2012, the court found that Father's progress toward alleviating or mitigating the causes necessitating placement had been "adequate but incomplete." The court ordered that reunification services continue to be provided to each parent and authorized DPSS to place X.M. with the maternal aunt in Maryland upon approval under the Interstate Compact on the Placement of Children.

C. *Twelve-month Review Period (November 2012 – May 2013)*

During the 12-month reporting period, Father lived in three different residences in Illinois and was at times homeless. As of the date of the social worker's status report, he was living with his brother in Chicago Heights, Illinois. He was unemployed and not participating in any educational or vocational programs.

Father's progress and compliance with his case plan was again described by the social worker as "satisfactory" and "adequate." He maintained contact with DPSS, participated in services, completed a parenting program, and was working on his anger through counseling. Four random drug tests were negative.

Mother's progress was still unsatisfactory. She made only a minimal effort to participate in her case plan, continued to use illegal substances, and visited X.M. sporadically.

On February 26, 2013, X.M.'s foster mother told the social worker that Father was asking X.M.'s questions during a telephone call such as: "'Whose are you? Who do you

6

belong to[]?  What's your name?  What's my name?'"  X.M. answered the questions, "but got scared" and told the foster mother "that he did not know what was going on with his father, because he was acting crazy."  When X.M. talked with his maternal aunt in Maryland by telephone, he told the aunt how he was scared when Father called and that Father had been "acting crazy."  X.M. later expressed similar feelings about his Father's telephone call to the social worker, and told her how it reminded him of how his parents used to argue.

At the 12-month review hearing on May 7, 2013, the court found that Father's progress toward alleviating or mitigating the causes necessitating placement had been adequate but incomplete.  It continued reunification services for Father and terminated services for Mother.

D.  *Eighteen-month Review Period (May 2013 – December 2014)*

Father did not maintain consistent contact with DPSS during the 18-month reporting period.  On May 14, 2013, Father informed DPSS that he had moved to Minneapolis two weeks prior.  It appeared that he had no further contact with the social worker until September 3, 2013.  At that time, Father informed the social worker that he had been arrested in Minnesota for an outstanding warrant on July 1, 2013.

Meanwhile, X.M. had been placed with his maternal aunt in Maryland on July 2, 2013.  In August, a Maryland social worker visited X.M.  When asked how he would rate his life on a scale of 1 to 10, with 10 being the best he could imagine, he said it was a "10."  He also told the social worker that his life had been great with his biological

parents until they started fighting. He said he missed his parents and believed they still loved him.

In November, DPSS reported that X.M. and the maternal aunt had bonded and X.M. was thriving in the aunt's care. DPSS identified the aunt as a prospective adoptive parent.

Father was released from incarceration in Minnesota on October 28, 2013. When he spoke to a social worker about three weeks later, he said he was living on social security benefits and looking for work.

In a report prepared for the 18-month review hearing, DPSS recommended that Father's reunification services be terminated. The social worker reported that Father had made no progress in his case plan services, maintained "little to no contact with" DPSS, had been incarcerated for the preceding three months, and had no contact with X.M. during the reporting period. He had also failed to mitigate any of the safety concerns that led to the removal of X.M. from Father's care.

In November 2013, Father told a social worker he had spoken with X.M. three times in the month since his release. He said he planned to resume his life with X.M. and raise him in Minnesota.

In an addendum report, the social worker concluded that it "would be detrimental to return [X.M.] to the care of either parent, as they continue to deal with their own addictions. Neither parent appears ready at this time to accept the responsibility of

8

raising a child.  Neither parent has benefited from services nor shown the stability to safely parent [X.M.]"

At the 18-month hearing held on December 4, 2013, the court found that Father's progress toward alleviating or mitigating the causes necessitating placement had been unsatisfactory and that he had failed to make substantive progress on his case plan.  The court terminated reunification services and set a hearing to be held pursuant to section 366.26.

E. *Post-termination of Services (December 2013 – September 2014)*

In its section 366.26 report, DPSS reported that X.M. was developmentally on track, he had a good relationship with his maternal aunt, uncle, and cousin, he was "an independent thinker," and did well in school.  Regarding X.M.'s mental and emotional status, the social worker reported that X.M. had adjusted to living with his maternal relatives.

Father calls each Sunday to speak with X.M.  According to the social worker, X.M. "does not like to speak with his father on the telephone, because he fears his father will become angry with him."  Although X.M.'s anxiety about telephone calls from Father had diminished over time, he "simply says he does not want to talk with him . . . ."

In an assessment of the prospective adoptive parents, the social worker reported that they have been involved with X.M. since he was an infant, and X.M. recognizes them as his emotional parents.  X.M. is thriving in their care, and the prospective adoptive parents are prepared to parent him as their own child.

9

In an addendum report filed in June 2014, DPSS reported that Father moved into a clean and sober living environment on May 1, 2014, and was working as a baker through a temporary employment agency. Father told the social worker that he would like X.M. to live with him in Minnesota.

The section 366.26 hearing was originally set for April 3, 2014, and subsequently continued to June 12. On June 10, Father filed a section 388 petition. He requested that the order setting the section 366.26 hearing be vacated and he be given six more months of services.

Regarding changed circumstances, Father stated that he relocated to Minneapolis, was employed, and had housing that received "a favorable home study." He also finished his service plan and spoke to X.M. every week.

As for how the change would be in X.M.'s best interest, Father stated that he and X.M. "are extremely bonded. They speak on the phone each week. [Father] has secured housing, employment, and is sober. He was the only parental figure in [X.M.'s] life prior to removal. [X.M.] and his father deserve a chance to be a family."

The petition was supported by letters from his therapist in Chicago, Illinois.

The court set a hearing on the petition to be held concurrently with the section 366.26 hearing. The court subsequently continued the hearings to August 21, 2014.

In an addendum report, filed three days before the hearing, a social worker reported on conversations she had with X.M., Father, the maternal aunt, and a Maryland social worker. Regarding telephone calls from Father, X.M. said that when Father called,

he was "busy with summer activities and he does not have time to speak with his father on the telephone." Father told the social worker that he called X.M. on Sundays, but "every time he called he got a voice message." The maternal aunt told the social worker that Father berated X.M. during telephone calls and that X.M. became frightened when he had to speak with Father. The Maryland social worker said she had visited the maternal aunt's home, that X.M. "was doing well," and that X.M. had told her "that he feels safe in the home and he enjoys living with his maternal aunt and uncle."

DPSS attached to the addendum an e-mail from the maternal aunt in which she stated: "[X.M.] has declined to speak with his father on multiple occasions and it is at his request not to do so. The few times he has accepted calls from his father, his father has been abrasive, and aggressive. [X.M.] has seemed fearful and wary of continuing the conversations. On one occasion we had to terminate the conversation between [X.M.] and his father. At which time, the father phoned agitated and left a very unpleasant voice message."

The social worker opined that it would be detrimental to return X.M. to Father because Father "has not completed his services and he is not stable . . . and not able to provide for his son." The social worker further stated that the services Father referred to in his section 388 petition "were previous services already filed in previous reports. There is nothing new to report on the father, therefore there has not been a change of circumstances."

11

DPSS filed another addendum report in September 2014. Father told the social worker that he was working as a baker, and had a one-bedroom apartment at the clean and sober living facility. He said he was still getting his life together so that X.M. could live with him in Minneapolis. Regarding telephone calls to X.M., Father told the social worker he forgot about the time difference between Minnesota and Maryland and that he had failed to call on some Sundays. The social worker told Father that the caregivers and X.M. waited for his call each Sunday for five successive weeks in June and July, but Father did not call.

The addendum report stated that Father had tested for alcohol and drugs on 12 dates in May, June, and July 2014. The first test, on the date Father began living at the clean and sober living facility, showed a positive test for alcohol. The social worker spoke with Father's case manager at the facility, who reported that Father's tests initially showed alcohol levels that were "much higher," but had decreased each week.

Regarding Father's living arrangements, the case manager explained that if Father obtained custody of X.M., he could not continue to stay in the facility; he would have to apply for family housing, which was very limited, and be put on a waiting list. Other parents with children had been on that waiting list "for quite some time."

The social worker spoke with X.M. on August 30, 2014. X.M. told the social worker that he called his maternal aunt and uncle "'mom and dad,'" but knew that his real parents were living somewhere else. The social worker asked X.M. if he knew the difference between legal guardianship and adoption. X.M. said he did, and that he would

12

prefer to live where he is and that he wanted to be adopted. X.M. said he knew he had another mom and dad, but he enjoyed living with his aunt and uncle. The social worker concluded that X.M. "appears to be very content with his life, school and community of friends."

X.M. told the social worker he had spoken with Father a few times on the telephone, "but he has been scared, because his father sounded angry when he called." He told his caretakers "he does not want to come to the phone" when Father called. The aunt told the social worker that X.M. was told he could return the call, but "[m]ost of the time the child has stated he is busy with another activity or will call later."

The hearing on the section 388 petition took place on September 10, 2014. DPSS submitted its recent reports and addenda. No testimony was offered. Minor's counsel made the following statement: "I was able to explain the difference between the adoption and guardianship with [X.M.] inasmuch as an 8-year-old third grader could understand. He did state he does know his parents. He does know he has a mother and a father. [¶] He does have contact with his father and does visit with his father . . . . He does know he has another mom and dad and that he enjoys living with his aunt and uncle. . . . [¶] He does want to remain with his aunt and uncle until he's an adult, but he would like to have visitation with his father. With his limited understanding of adoption and guardianship, the minor did request guardianship. However, in the social worker's report he stated he wanted to be adopted."

13

After hearing arguments, the court denied the section 388 petition. The court found "that father has changing circumstances," but could not "make the finding of changed circumstances." The court added: "And even if I could make that finding, . . . this Court cannot get to the second prong, which is best interest."

The court then held the section 366.26 hearing. No additional evidence was submitted. Although minor's counsel had informed the court of X.M.'s statement to her that he wanted guardianship, she told the court that X.M. "does have a very stable and loving home" with caregivers who are "very committed to the adoption of this child." She concluded that "we're at this point right now where the father has had several years to reunify and it hasn't happened, and I believe the minor needs permanency at this time."

Counsel for Father argued that X.M. "does want to have a relationship with his father and to maintain contact" and urged the court to consider guardianship as an alternative to adoption. Counsel further argued that the exception to adoption based on the benefit to X.M. from continuing his relationship with Father applied in this case.

The court rejected Father's arguments, stating that "[t]ermination of parental rights would not be detrimental to this minor. This Court cannot find any of the exceptions [to adoption] are applicable to this case" and "[a]doption is in the best interest of this minor child." The court then terminated the parents' parental rights.

14

III.  DISCUSSION

A. *Denial of Father's Section 388 Petition*

Section 388 allows the parent of a dependent child to petition the juvenile court to change, modify, or set aside a previous order of the court.  Under the statute, the parent has the burden of establishing by a preponderance of the evidence that (1) there is new evidence or changed circumstances justifying the proposed change of order, and (2) the change would promote the best interest of the child.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; § 388, subds. (a), (b).)  The decision to grant or deny the petition is addressed to the sound discretion of the juvenile court, and its denial of the petition will not be overturned on appeal unless an abuse of discretion is shown.  (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]"  (*In re Stephanie M., supra,* 7 Cal.4th at p. 317, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 302, 309.)  Still, "[s]ection 388 plays a critical role in the dependency scheme.  Even after family reunification services are terminated and the focus has shifted from returning the child to his parent's custody, section 388 serves as an 'escape mechanism' to ensure that new evidence may be considered before the actual, final termination of parental rights.  [Citation.]  It 'provides a means for the court to

15

address a legitimate change of circumstances' and affords a parent her final opportunity to reinstate reunification services before the issue of custody is finally resolved." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506.)

In this case, the problems that led to the removal of X.M. from Father included domestic violence and Father's history of alcohol abuse. His case plan included counseling, completion of a domestic violence and anger management program, and substance abuse testing. In addition to sobriety and anger management, his plan objectives included obtaining resources to meet X.M.'s needs and a stable and suitable residence for him and X.M.

By the time of Father's section 388 petition, Father had completed a parenting course, had been addressing anger management issues through counseling, and was living in a clean and sober living environment. There was no evidence of any domestic violence since the dependency began and only one positive test for alcohol. In light of these encouraging developments, the trial court appropriately "commend[ed] him for what he has done."

Nevertheless, there is substantial evidence to support the court's finding that Father's circumstances were "changing," but had not "changed." Father had only recently moved into a clean and sober living facility and his positive test in May 2014 suggested a possible relapse. More importantly, the clean and sober living facility could not accommodate X.M. and there was no assurance that Father could obtain a stable and suitable residence for both him and X.M. any time soon.

16

There is also evidentiary support for the court's finding that granting the section 388 petition would not be in X.M.'s best interest.  In light of the time Father had been incarcerated before the start of the dependency proceeding and the nearly two years since then, it appears that X.M. had not been under Father's care for more than short periods of time over the last four or five years.[3]  In his current placement, X.M. was living with a maternal aunt and uncle, his prospective adoptive parents.  He was, as the court observed, "finally in a stable home."  Moreover, he had bonded with the maternal relatives, called them "mom and dad," and had rated his life under their care a 10 on a 1-to-10 scale.  At this point in the proceedings, the court's focus is on the child's interest in permanency and stability.  (See *In re Marilyn H., supra,* 5 Cal.4th at pp. 307-309; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.)  Any further delay in establishing that permanency and stability necessarily resulting from further services being provided to Father would not be in X.M.'s best interest.

Because there is substantial evidence to support the court's findings on each of the two section 388 prongs, the court's denial of Father's section 388 petition is not an abuse of discretion.

B.  *Parental Benefit Exception to Adoption*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re*

---

[3]  See *ante*, footnote 2.

17

*S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal or parental rights of the child's natural parents. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] . . . The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "Benefit," for this purpose, means that "the well-being of the child [is promoted] to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed,

18

the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

We apply the substantial evidence standard of review to factual issues, such as the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The analysis is essentially the same under both standards. As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . ."'" [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Initially, we observe that Father did not maintain regular visitation and contact with X.M. In the first three months of the dependency, when Father was still in California, Father's visits were "not consistent." Instead of one, two-hour visit per week, Father visited only one or two times per month, for as little as 10 minutes. After he moved to Illinois and Minnesota, Father could not have face-to-face visits with X.M., but, at least initially, he talked to X.M. each week. During his incarceration in Minnesota from May through October 2013, Father had no contact with X.M. For some time following his release, he spoke with X.M. about once each week by telephone. More

19

recently, however, Father would "forget" to call X.M. and, during a five-week period in June and July 2014, made no calls to X.M.

Even if Father satisfied the requirement of maintaining regular visitation, he failed to establish that severing the parent/child relationship would deprive X.M. "of a substantial, positive emotional attachment such that the child would be greatly harmed." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Indeed, the lack of such an attachment is shown by Father's inconsistent contact with X.M. and by X.M.'s feelings regarding Father's telephone calls. X.M. told his aunt and the social worker that he was scared and frightened by Father's calls because Father sounded angry or crazy, or berates X.M. As time went on, X.M. indicated he did not wish to speak to Father when he called and did not want to return Father's calls. In addition, X.M. had bonded with his maternal relatives and was thriving under their care. He indicated to both the social worker and his counsel that he wanted to continue living with his aunt and uncle until he was an adult. There is no evidence to suggest that severing the parent/child relationship would cause X.M. any harm.

Father relies on *In re S.B., supra,* 164 Cal.App.4th 289. In *In re S.B.*, a bonding study described the bond between the child and parent as "'fairly strong' or 'moderate.'" (*In re S.B., supra,* at p. 295.) "During the study, S.B. sat in [the father's] lap, played games and colored. [The father] was responsive to her requests. In the middle of coloring, S.B. said to [the father], 'I love you,' and he responded in kind. S.B. whispered and joked with [the father] and then spontaneously said, 'I wish I lived with you and

20

Mommy and Nana.'" (*Ibid.*) At the hearing, the author testified that "because the bond between [the father] and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id.* at p. 296.) The trial court found that the beneficial relationship exception did not apply and the Court of Appeal reversed, stating: "The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [the father]." (*Id.* at pp. 300-301.)

The present case is easily distinguishable from *In re S.B.* Here, there was no bonding study or other evidence to suggest that Father and X.M. had a fairly strong or moderate bond, no reports that X.M. told his Father he loved him, and in contrast to S.B.'s expressed wish to live with her father, X.M. unequivocally declared his desire to live with his maternal aunt and uncle.

In light of the inconsistent contact between Father and X.M. during the dependency, the weak evidence of a substantial, positive bond between Father and X.M., and the lack of evidence that X.M. would be harmed if the parent/child relationship is severed, the court did not abuse its discretion in determining that the beneficial parental relationship exception to adoption did not apply.

Under a separate heading, Father contends the court should have ordered a plan of legal guardianship based on the evidence of a parent-child bond in this case. We reject this argument. If, as we have just concluded, the court did not abuse its discretion in

21

determining that the statutory beneficial parental relationship exception did not apply, there is no basis for finding a nonstatutory exception to adoption based on a parent-child bond.

## IV.  DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

HOLLENHORST _____

Acting P. J.

MILLER _____

J.